**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 19-00112-01-CR-W-HFS** |
| | ) | |
| | ) | |
| **CREGG MATTHEWS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Cregg Matthews's Motion to Suppress Evidence filed March 18, 2020. Doc. 73. The Government filed Suggestions in Opposition on April 17, 2020. Doc. 78. Defendant did not file a reply, and the time for doing so has passed. L.R. 7(c)(3). For the reasons set forth below, it is recommended that Defendant's motion to suppress be DENIED.

## I.       BACKGROUND

The grand jury returned a superseding indictment charging Defendant Matthews with knowingly and intentionally possessing with an intent to distribute 500 grams or more of methamphetamine on or about March 9, 2019. Doc. 65. Defendant's motion seeks to suppress evidence seized from a duffel bag that he was carrying when he was stopped and subsequently arrested at a bus station on March 9, 2019. Doc. 73.

On July 27, 2021, the undersigned held an evidentiary hearing on Defendant's motion to suppress. Mr. Matthews was present and represented by counsel, Willis Toney. The Government was represented by Assistant United States Attorney Sean Foley. At the evidentiary hearing, six witnesses testified: (1) Trooper Neil Jannin, (2) Corporal Tim Craig, (3) Sergeant Greg Primm, (4)

Detective Antonio Garcia, (5) Sergeant John Pickens, and (6) Defendant Cregg Matthews. Additionally, fifty (50) exhibits were admitted into evidence. *See* Docs. 133-34.

## II.     FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following:

### Confidential Informant Provides Information and Phone Numbers

1.     Trooper Neil Jannin, an officer with twelve years' experience in law enforcement, has worked with the Missouri State Highway Patrol ("MSHP") since January 2009. Tr. at 20.[1] In March 2019, he was assigned to the Mineral Area[2] Drug Task Force of the narcotics division and was responsible for investigating narcotics cases. Tr. at 20-21, 33.

2.     On March 4, 2019, Trooper Jannin met with a confidential informant ("C.I.") to discuss the flow of narcotics. Tr. at 21, 23. The C.I. provided information that an individual known by the nickname "LA" was attempting to obtain a large quantity of methamphetamine from California and bring it back to St. Louis, Missouri. Tr. at 23, 25, 46. According to the C.I., "LA" previously had a girlfriend present when the C.I. purchased narcotics from him. Tr. at 23-24. Prior to the March 4, 2019 meeting, the C.I. had not provided information about Defendant or his girlfriend to Trooper Jannin. Tr. at 33-34, 41.

3.     The C.I. also provided two telephone numbers associated with LA, one being 314-203-1342. Tr. at 24, 34. Trooper Jannin initiated a process referred to as deconfliction to determine who was associated with the phone number. Tr. at 34. Deconfliction utilizes prior cases

---

[1] "Tr." refers to the Transcript of Suppression Hearing. Doc. 136.

[2] According to Trooper Jannin, "Mineral Area" refers to an area in southeast Missouri consisting of St. Francois County, Iron County, Madison County, and sometimes Jefferson County, Missouri. Tr. at 21.

from federal, state, and local agencies to determine who is connected to a particular phone number. Tr. at 34.

4.    Trooper Jannin's investigation linked the 314-203-1342 phone number to Defendant Cregg Matthews. Tr. at 24, 48. It also indicated Defendant was associated with the nickname "LA." Tr. at 38, 46. The trooper did not verify the identity of the person who originally activated the number with the cellular provider – Verizon. Tr. at 34-37. The other phone number provided by the C.I. was believed to belong to Defendant's girlfriend. Tr. at 27, 31.

5.    The trooper applied for and received two global positioning system ("GPS") tracking search warrants[3] for the two phone numbers. Tr. at 24-26, 36; Gov't Ex. 1. On or about March 6, 2019, Trooper Jannin provided the search warrants to Verizon. Tr. at 27.

6.    On March 7, 2021, Verizon began tracking the two phone numbers and provided "pings" every fifteen minutes to Trooper Jannin. Tr. at 28-31, 44-45. A ping provides a GPS location (longitude and latitude) of a cell phone number and the date and time the location is transmitted by a cell tower. Tr. at 30, 58.

7.    When tracking was initiated, the two phones were pinged in Nevada and appeared to be traveling west along the I-70 corridor. Tr. at 27, 30, 48; Gov't Exs. 2, 3. The phones eventually arrived in Los Angeles, California, and remained there for approximately three days.[4] Tr. at 27-28, 30-31; Gov't Exs. 2, 3.

8.    As the phones returned east, they took separate routes. Tr. at 31. The phone believed to be associated with Defendant's girlfriend took a southern route along I-44, and the phone believed to be associated with Defendant took a more northern route. Tr. at 30-31.

---

[3] GPS tracking warrants allow investigators to gather information based on an individual's location. Tr. at 24.

[4] Trooper Jannin knows California to be a "source state" for narcotics. Tr. at 28. A "source state" is usually a state that borders Mexico because large quantities of drugs travel north from Mexico into the United States. Tr. at 28.

3

9.      Law enforcement continued to track the suspected girlfriend's phone location, and conducted a traffic stop of her vehicle once it entered Missouri. Tr. at 31, 40, 46-47, 49, 56, 65. The girlfriend was present in the vehicle. Tr. at 31. Officers searched the vehicle, but no narcotics were found. Tr. at 31-32, 40, 46-47, 56, 65-66.

10.     Because he was involved with the traffic stop, Trooper Jannin forwarded the pings from the second phone being tracked to Corporal Timothy Craig,[5] who also works in the narcotics division. Tr. at 32, 41-43, 53. When law enforcement stopped the suspected girlfriend's vehicle, the phone believed to be associated with Defendant was located in Denver, Colorado. Tr. at 56, 62.

11.     With Verizon providing GPS information to him every fifteen minutes, Corporal Craig continued to track the second phone to attempt an interdiction stop somewhere in Kansas. Tr. at 57, 62-64. At that time, he did not know the person's mode of transportation. Tr. at 57.

12.     The corporal contacted a Kansas Highway Patrol ("KHP") trooper about the phone's location and the route it appeared to be taking. Tr. at 58. Corporal Craig also contacted Sergeant Greg Primm[6] who was assigned to the narcotics task force in Kansas City, Missouri to continue the investigation. Tr. at 57.

---

[5] Corporal Craig, an officer with twenty years' experience, is a coordinator for the MSHP Drug Task Force. Tr. at 53-54. In March 2019, he was assigned to the Mineral Area Drug Task Force where he handled all facets of narcotics investigations including drug buys, search warrants, and interdictions. Tr. at 53. Prior to the traffic stop in this case, Corporal Craig had been informed GPS tracking warrants had been obtained for two individuals suspected of transporting narcotics. Tr. at 54. When he first became involved in the investigation, the two phones were in Los Angeles, California. Tr. at 55. He also knew that California was a "border state" and a source of entry of narcotics from Mexico. Tr. at 55. Corporal Craig did not personally verify who owned the phones being tracked. Tr. at 64-65, 71.

[6] Sergeant Primm works as a master sergeant with the MSHP and is currently assigned to the Kansas City Interdiction Task Force through the DEA. Tr. at 74. He has twenty years of law enforcement experience and has worked for the MSHP for the duration of his career. Tr. at 74.

13.     They initially contacted Sergeant Primm to use his network of other interdictors across the United States to attempt an intercept as the second phone was believed to be traveling on Interstate 70.  Tr. at 76-77, 80.  Corporal Craig advised Sergeant Primm that the team had been investigating two people whose tracked phones had traveled together to Los Angeles to "source meth," but at some point, the phones split up with one number traveling the I-44 corridor, and the other traveling the I-70 corridor.  Tr. at 67-68, 76.

14.     As he was updated on the locations of the second phone, Corporal Craig noticed the pings would, at times, remain in one location for a longer period than what would typically occur if someone was constantly traveling.  Tr. at 58-59, 61.

15.     Corporal Craig continued to work with the KHP trooper and relayed the ping locations.  Tr. at 59.  Based on their investigation of the route, and the delays in certain areas, the KHP trooper and Corporal Craig believed the stops may be associated with the Greyhound Bus system.  Tr. at 59-60.

16.     Corporal Craig searched the Greyhound Bus phone application for eastbound routes departing around the time the second phone left the Los Angeles area.  Tr. at 60.  The application displayed live tracking of the buses, and the corporal located a bus traveling the same route with stops consistent with the location pings.  Tr. at 60.

17.     Based on this information, Corporal Craig believed Defendant was traveling on a Greyhound Bus.  Tr. at 60.  He contacted Sergeant Primm and advised him the next scheduled bus stop was in Kansas City, Missouri.  Tr. at 60-61, 73.  Sergeant Primm told Corporal Craig he would contact members of his narcotics unit task force to try to intercept Defendant at the Kansas City bus station.  Tr. at 61.  The bus station is located at 1101 Troost in Kansas City, Missouri.  Tr. at 116.

5

18.     Corporal Craig or Trooper Jannin provided Sergeant Primm with Defendant's name and his photograph.  Tr. at 80-83.  The sergeant was unaware if anyone had confirmed the phone being tracked actually belonged to Defendant.  Tr. at 79.

19.     Sergeant Primm then contacted Sergeant John Pickens[7] with the Kansas City, Missouri Police Department ("KCPD") who routinely performs interdiction work at the Kansas City Greyhound bus stop.  Tr. at 78.  He informed Sergeant Pickens that they believed an individual suspected of carrying over twenty pounds of methamphetamine would be traveling through Kansas City from California.  Tr. at 81, 113, 155-57.  He also forwarded Defendant's photograph to Sergeant Pickens, along with Defendant's name, date of birth, height, and weight.  Tr. at 81-82, 113-14, 156; Gov't Ex. 4.

20.     According to Sergeant Pickens, Greyhound buses stop in Kansas City, Missouri, because it is a service station for the buses.  Tr. at 118.  When a bus arrives in Kansas City, all passengers typically exit so the bus can be cleaned, fueled, and general maintenance can be completed.  Tr. at 88-89, 118.  The bus route Defendant was suspected of traveling is one from which Sergeant Pickens and his team frequently interdict narcotics because California is a known source state for narcotics.  Tr. at 117-18.

21.     Sergeant Pickens was asked to contact Defendant at the Greyhound bus station in Kansas City regarding a drug investigation.  Tr. at 115, 155, 157.  He checked Defendant's name in the computer and discovered Defendant had a felony conviction and was previously known to be violent toward law enforcement.  Tr. at 115, 159-60, 177.

---

[7] Sergeant Pickens, a sergeant with twenty-three years' experience with KCPD, worked for the interdiction metro meth unit in March 2019.  Tr. at 110-12.  This KCPD unit focuses its investigations on mass transit, including trains and buses, as well as parcels through UPS, FedEx and the United States Post Office.  Tr. at 112.  The investigative focus of the interdiction unit is to intercept large quantities of illegal drugs, money, and guns being transported across the country.  Tr. at 111.

6

22.    When conducting interdiction at the bus station, Sergeant Pickens and his team typically wear plain clothes so that they blend in with the other passengers. Tr. at 118; Gov't Ex. 5-7, 47-49.[8] Investigators will typically watch exiting passengers to see if anyone acts nervous or different than the other passengers. Tr. at 118-19.

**Stop of Defendant on March 9, 2019**

23.    On March 9, 2019, Sergeant Pickens arrived at the bus station and watched the passengers exit the bus that had originated from Los Angeles. Tr. at 120, 123; Gov't Ex. 6 at 22:41:03. Sergeant Pickens believed Defendant was one of the last passengers to exit the bus. Tr. at 124-25. He found this suspicious because, in his experience, drug traffickers often wait to exit until the end to watch for police. Tr. at 124-25. The sergeant observed Defendant exit the bus and enter the bus station carrying a small black handbag with gray straps. Tr. at 124; Gov't Ex. 6 at 22:41:50.

24.    Sergeant Pickens identified Defendant and attempted to make consensual contact with him. Tr. at 127, 172, 174-75, 185; Gov't Ex. 5 at 22:42:02. The sergeant approached Defendant, identified himself as a KCPD officer, presented his badge and identification card, and asked to see his bus ticket. Tr. at 128-29; Gov't Ex. 5 at 22:42:04. Sergeant Pickens asked Defendant if he could talk to him. Tr. at 129. Defendant agreed to talk and responded, "Yeah, sure. Am I in trouble?" Tr. at 129, 168. Sergeant Pickens told Defendant he had not done anything wrong, and he talked to passengers traveling across the country trying to keep everyone safe. Tr. at 168-69.

---

[8] During the hearing, the Greyhound bus station's video surveillance footage was admitted as Government's Exhibits 5 through 7 and 47 through 49. References to the video surveillance footage shall refer to the time counter at the top of each video.

25.     Defendant then handed his bus ticket and Missouri identification card to Sergeant Pickens.  Tr. at 128-29, 166, 188-90; Gov't Exs. 5 at 22:42:53, 12-13.  The bus ticket provided by Defendant listed the passenger's name as "Craig Matthews."  Tr. at 133-34, 151, 166; Gov't Ex. 13.  The Missouri driver's license identified Defendant as Cregg Matthews.  Tr. at 133-34; Gov't Ex. 14.  Sergeant Pickens did not keep possession of Defendant's items after he inspected them. Tr. at 185; Gov't Ex. 5 at 22:43:52.

26.     Upon contacting him, Sergeant Pickens testified he immediately detected a strong odor of marijuana on Defendant's person.  Tr. at 129, 161-62, 163-64, 174-75.  As Defendant and the sergeant talked, other interdiction officers were also in the bus terminal and positioned approximately five feet behind Defendant, twenty feet in front of him near the terminal's door, and standing to the side of him, separated by a rope line barrier.  Tr. at 161, 169, 186-87; Gov't Ex. 5 at 22:42:20.  Tr. at 161.  According to Sergeant Pickens, the officers were in close proximity, but far enough away so they did not impose on Defendant's personal space.  Tr. at 161, 186-87.

27.     Sergeant Pickens testified that during their conversation, Defendant repeated every question he asked.  Tr. at 130.  He found this suspicious because it is common for drug couriers to stall and try to fabricate a lie while talking with law enforcement.  Tr. at 130.

28.     Defendant told Sergeant Pickens he traveled to California by Greyhound bus, remained there for one or two days, and was traveling back to St. Louis, Missouri.  Tr. at 130. Again, the sergeant found Defendant's statements suspicious because the bus trip takes almost two days, and Defendant only stayed in California for one or two days.  Tr. at 130-32.

29.     Sergeant Pickens also noticed Defendant's bus ticket was a one-way ticket from California to St. Louis, which he found suspicious because round-trip tickets are generally cheaper than one-way tickets.  Tr. at 130-32; Gov't Ex. 13.  Also, in the sergeant's experience, narcotic

traffickers often purchased one-way tickets because they would not know when the narcotics would be delivered to them, and as a result, would not know when they could return.  Tr. at 132-33.  The sergeant also observed Defendant's bus ticket cost $220, and it was paid in cash.  Tr. at 131-32, 167; Gov't Ex. 12-13.  Sergeant Pickens found all of these facts suspicious.  Tr. at 131.

30.     Sergeant Pickens believed Defendant's story was fabricated and stated that he appeared to be nervous during their conversation.  Tr. at 136, 170.  According to the sergeant, Defendant continuously looked down toward his bag, and his pocket, and had sweat buildup on his nose and forehead.  Tr. at 136.  Defendant also looked around with his eyes as if to find a place to flee.  Tr. at 136.

31.     Sergeant Pickens told Defendant he suspected him of transporting narcotics and asked Defendant if he would allow a canine to sniff his bag.  Tr. at 134-35, 191.  According to Sergeant Pickens, Defendant initially consented to the canine sniff, but then revoked his consent.  Tr. at 135, 173, 191-92.

32.     At this stage of the encounter, although Sergeant Pickens had already determined to seize Defendant's handbag and subject it to a canine sniff, he was still seeking cooperation and his consent.  Tr. at 135, 175-76, 192.  Sergeant Pickens renewed his request to allow the canine sniff and indicated he was going to have the dog conduct a sniff regardless at this point.  Tr. at 135.  Sergeant Pickens never advised Defendant he was free to leave.  Tr. at 183-85.

33.     Defendant and Sergeant Pickens then walked toward the doors.  Tr. at 139; Gov't Ex. 7 at 22:44:26.  When Defendant tried to walk away, Sergeant Pickens did not allow that to happen.  Tr. at 172-73; Gov't Ex. 5 at 22:44:50.  Sergeant Pickens decided to seize or detain Defendant to conduct a frisk for weapons based on the odor of marijuana on his person and because

9

Defendant was refusing to release the bag. Tr. at 139-40, 172-73, 175, 183-84. He also believed Defendant could be armed. Tr. at 176-77.

34.    Sergeant Pickens escorted Defendant toward the door of the terminal and asked if he was armed with any weapons. Tr. at 139, 176-77; Gov't Ex. 7 at 22:45:10. Defendant said he did not have a gun, but, according to the sergeant, Defendant appeared to be looking down toward his pocket. Tr. at 139, 177-78.

35.    Sergeant Pickens observed Defendant's pants pocket to be heavy and bulky, so he attempted to conduct a frisk for possible weapons. Tr. at 139, 176-78, 181; Gov't Ex. 7 at 22:45:17. When the officer attempted the frisk, Defendant pulled away, turned his hip away from the sergeant, and a scuffle ensued. Tr. at 139, 181, 184; Gov't Ex. 7 at 22:45:29. Defendant was officially taken into custody upon his resistance to the frisk. Tr. at 184. Sergeant Pickens did not find a weapon on Defendant's person after the frisk. Tr. at 139, 179.

36.    During the frisk and ensuing scuffle, another officer conducting interdiction, Sergeant Gentry, entered the station carrying a suitcase recovered from the bus. Tr. at 140; Gov't Ex. 7 at 22:45:56. After the frisk, Sergeant Pickens learned the suitcase had a tag with Defendant's name on it, and the narcotics canine had positively alerted to it for the odor of narcotics. Tr. at 140, 182-83.

37.    Based on the alert, Sergeant Pickens and his team arrested Defendant and escorted him to the law enforcement office in the back of bus station. Tr. at 140, 182-84, 187-88; Gov't Ex. 7 at 22:46:03. Sergeant Pickens searched Defendant incident to arrest and discovered two cell phones and a bag of marijuana and methamphetamine in his front right pocket where he had previously observed the bulge. Tr. at 141, 164-66, 178; Gov't Ex. 46; Def. Ex. 1. During his

interview with Sergeant Pickens, Defendant stated he had two phone numbers, and one phone number was 314-203-1342. Tr. at 148.

38.     Simultaneous to Defendant's initial encounter with Sergeant Pickens inside the bus station, Detective Antonio Garcia and his narcotics canine, Zina, conducted a sniff check of the Greyhound Bus. Tr. at 119.

### Simultaneous Canine Sniff Check of the Greyhound Bus

39.     Antonio Garcia, a KCPD detective with twenty-four years' experience, works as a detective with the drug interdiction unit as a canine handler. Tr. at 84-85. Detective Garcia and his dog are responsible for conducting sniff checks for narcotics at Greyhound bus stations, the Amtrak train station, and commercial parcel facilities, such as FedEx, UPS, and the United States Post Office. Tr. at 85-86, 100.

40.     On the evening of March 9, 2019, Detective Garcia and Zina[9] worked drug interdiction at the Kansas City Greyhound bus station. Tr. at 87, 119. He was specifically asked to assist with the bus originating from Los Angeles, which he knew was a source city for illegal narcotics. Tr. at 88.

41.     Before conducting any sniff checks of the bus, Detective Garcia had not been told the officers were looking for a specific person. Tr. at 92, 98-99. Additionally, he did not know where Defendant had been sitting, and he was not looking for Defendant's bag. Tr. at 92, 98-99. Detective Garcia was informed that law enforcement suspected a bus passenger was carrying more than twenty pounds of methamphetamine. Tr. at 158.

---

[9] Zina is a certified narcotics canine with who is trained to alert to the odor of marijuana, cocaine, methamphetamine, and heroin. Tr. at 85-86. Zina maintained a certification in narcotics detection, and on March 9, 2019, her certification was still in effect. Tr. at 86-87, 99-100; Gov't Ex. 8. According to Detective Garcia, Zina never provided a false alert during her years of service as a police K9. Tr. at 100.

11

42.     Once the bus originating in Los Angeles arrived at the Kansas City bus station, Detective Garcia deployed Zina.  Tr. at 88.  The detective opened the luggage bins, and Zina conducted sniff checks of the lower luggage compartments.  Tr. at 88-89, 119.  Zina did not alert to narcotics in the lower luggage compartments.  Tr. at 89.

43.     After the passengers exited the bus, Zina and Detective Garcia boarded the bus and conducted a sniff check of the luggage inside, starting at the back of the bus.  Tr. at 89-90, 100, 105.  Zina contacted a black-colored soft-sided suitcase in the overhead compartment above seat number twenty-two and positively alerted for the odor of narcotics.[10]  Tr. at 90, 100-01.

44.     The tag attached to that suitcase displayed the name "Cregg Matthews," the telephone number "314-203-1342," and "St. Louis, Missouri."  Tr. at 91; Gov't Exs. 17-19. Detective Garcia advised Sergeant Gentry of Zina's positive alert.  Tr. at 91-92, 101.  Sergeant Gentry then boarded the bus and removed the bag.  Tr. at 92, 101.

45.     Detective Garcia learned the arresting officers seized another bag, so he responded with Zina to conduct a sniff check of the other seized bag.  Tr. at 92-93, 102-04.  Per law enforcement's protocol for seized bags suspected of containing narcotics, the second bag was placed in the luggage area among unrelated bags.  Tr. at 93-94, 103, 141.  Detective Garcia responded with Zina to conduct a sniff check of all luggage in the area, and she alerted to the presence of narcotics when she contacted a black handbag with gray-colored handles.  Tr. at 94, 141-42.  Detective Garcia later learned the second bag belonged to Defendant.  Tr. at 94.

46.     The detective advised the officers of Zina's positive alert and applied for search warrants for both bags.  Tr. at 94-96, 103-05, 141-43; Gov't Exs. 9-10.  The search warrants were

---

[10] Zina is trained to alert to the presence of narcotics by sitting.  Tr. at 89, 99-100.  She has previously alerted to the presence of narcotics hundreds of times when conducting sniff checks of the bus originating out of Los Angeles.  Tr. at 88.

12

signed and returned to law enforcement around 9:43 a.m. on March 10, 2019. Tr. at 142; Gov't Ex. 9. Law enforcement then executed the warrants and searched the bags. Tr. at 142-43.

47. The officers found ten pounds of a crystal substance and a personal amount of a green leafy substance inside the black-colored handbag Defendant was carrying at the time of his arrest. Tr. at 129-30, 143, 145-46, 165; Gov't Exs. 9, 33-36, 38. The crystal substance field-tested positive for methamphetamine, and the green leafy substance field-tested positive for marijuana. Tr. at 143, 146-47; Gov't Exs. 33-36, 38.

48. The officers found approximately twenty-two pounds of a crystal substance inside the black suitcase recovered from the bus with the name tag indicating it belonged to Cregg Matthews. Tr. at 140, 143-45, 147, 151; Gov't Exs. 10, 28, 43. The crystal substance also field-tested positive for methamphetamine. Tr. at 143; Gov't Ex. 43.

49. Sergeant Pickens also testified that had Zina alerted to the suitcase on the bus, but he had not yet contacted Defendant, the officers would have used several tactics such as paging the passenger to the front desk, setting the bag in question separate from all other bags, or checking the passengers' tickets as they reboard the bus to determine if there is a name on a ticket that matches the name on the bag in question. Tr. at 149-50.

50. According to Sergeant Pickens, the likelihood they would have identified Defendant as the owner of the bag on the bus was "one hundred percent." Tr. at 151. When a drug dog alerts to luggage on board the bus, the passenger is placed under arrest. Tr. at 151. If the passenger also possessed a handbag, it would have been seized, subjected to a dog sniff and a search warrant sought (if there had been a positive alert). Tr. at 152.

13

## Defendant's Testimony at the Suppression Hearing[11]

51.     Defendant testified at the suppression hearing that he was traveling via Greyhound bus, which stopped at the Kansas City bus station on March 9, 2019.  Tr. at 197-99.  Defendant testified he was on the phone[12] as he walked into the bus terminal when he was stopped by Sergeant Gentry.[13]  Tr. at 197-98.  Defendant maintains he had not smoked marijuana and did not smell like marijuana.  Tr. at 205.

52.     Defendant told the officers to wait, finished his phone conversation, and placed his phone in his pocket.[14]  Tr. at 199.  According to Defendant, Sergeant Pickens also approached him during his conversation with Sergeant Gentry and showed him his badge.  Tr. at 198, 210.

53.     Defendant testified that both officers asked for his identification.[15]  Tr. at 198.  He advised the two officers that he did not have to show them anything.  Tr. at 198-99, 210.  But then he handed the officers his identification and his bus ticket.  Tr. at 199-200, 209-10.

---

[11] Defendant was reminded, on the record, by his counsel of his right not to testify.  Tr. at 196-97.  Despite this reminder, Defendant was adamant in his decision to testify.  *Id.*

[12] The bus terminal footage does not show Defendant was on the phone as he entered the bus terminal.  Gov't Ex. 6 at 22:41:50.

[13] The video surveillance footage does not show the presence of Sergeant Gentry when the contact with Defendant was initiated by Sergeant Pickens.  *See* Gov't Exs. 5-7, 47-49.  Defendant testified the video was "indoctrinated," "altered," and "tampered"; however, no other evidence beyond Defendant's testimony was presented regarding the authenticity of the video surveillance footage.  Tr. at 198.  Defendant also testified that in all of his travels through Kansas City, "these people" have always grabbed him, searched his property, taken him to a back room where they placed him on the floor and restrained him, and searched him and his property during "multiple travels."  Tr. at 197.  There was no additional evidence adduced regarding Defendant's prior travels through Kansas City.

[14] Again, this testimony is not consistent with the video surveillance footage.  *See* Gov't Ex. 6 at 22:41:50.

[15] Again, the video surveillance footage does not show Sergeant Gentry involved in the initial encounter with Defendant.  Gov't Exs. 5-7, 47-49.

54.     Defendant testified he did not feel free to leave as the officers surrounded him and stood in front of him.[16]  Tr. at 200-01.  According to Defendant, the officers also locked the doors so he could not leave.[17]  Tr. at 200-01, 208.  At no point during their conversation did any officer point a gun at Defendant.  Tr. at 207.

55.     Defendant testified he attempted to leave, but Sergeant Pickens did not allow him to walk away.  Tr. at 200-01.  Sergeant Pickens asked Defendant if he could search him, and Defendant refused.  Tr. at 201-03.  According to Defendant, Sergeant Pickens then placed his hand in Defendant's pocket and retrieved his flip phone.  Tr. at 203.

56.     Defendant stated Sergeant Pickens did not take marijuana or methamphetamine out of Defendant's pocket.  Tr. at 200.  According to Defendant, the only item recovered from his person was a flip phone from his front pocket and another phone from his back pocket.[18]  Tr. at 200, 203.

57.     Defendant stated that after he was frisked, officers wrestled him down and took him to the back of the bus terminal.  Tr. at 204.  The officers took Defendant's bag from him, but at no point did he consent to officers taking or searching his bag.  Tr. at 204.

---

[16] Government's Exhibits 5 through 7 and 47 through 49 do not reflect officers "surrounding" Defendant.  Although other officers were present in the bus station, the only officer within close proximity of Defendant during the initial encounter was Sergeant Pickens.

[17] The video surveillance footage does not show any officers locking the doors to the bus station.  Gov't Exs. 5-7, 47-49.

[18] Defendant's testimony as to what was recovered from his person was inconsistent.  He initially testified Sergeant Pickens only recovered one phone from his pocket.  Tr. at 200, 203.  However, Defendant immediately contradicted himself by stating, "The other phone was in my back pocket."  Tr. at 203.  But upon further questioning, he then indicated he only had one phone.  Tr. at 203.

15

58.    According to Defendant, the officers brought him into a utility closet and interrogated him without reading his *Miranda* rights.  Tr. at 201, 204.  Defendant told the officers he did not have any drugs, and that all he had on him was marijuana.  Tr. at 204-05.

59.    At some point during their conversation, a Greyhound employee walked into the room in which Defendant was being questioned.  Tr. at 204, 211.  Subsequently, Defendant was read his *Miranda* rights, and he answered the officers' questions.  Tr. at 211-12.  The officers recorded Defendant's statement on an unknown device.  Tr. at 212.

60.    Defendant agreed his phone number was 314-203-1342 because law enforcement insisted that it was.  Tr. at 212-14.  Defendant was unaware there was a bag on the bus that displayed his name and the phone number 314-203-1342.  Tr. at 214-15.

61.    During his testimony, Defendant referred to a single bag and repeatedly insisted that his bag did not have his name on it.  Tr. at 214.  At the conclusion of the hearing, defense counsel confirmed Defendant was not claiming ownership of the suitcase on the bus.  Tr. at 217.  This is consistent with the position taken in Defendant's Motion to Suppress that he was not challenging the search and seizure of the suitcase seized from the bus.  Doc. 73 at 6.

62.    As noted above, Defendant's testimony on a variety of subjects conflicted with the video surveillance footage, as well as the testimony of the various law enforcement officers.  Further, Defendant's uncorroborated testimony that video surveillance footage had been altered and he had been the subject of prior instances of police misconduct in the Kansas City bus station is simply not credible.  During his testimony, Defendant's demeanor was nervous and stressful.  To the extent that Defendant's testimony is inconsistent with the testimony of the law enforcement officers in this case and/or the Government's exhibits, including the video surveillance footage,

16

the Court finds Defendant's testimony is not credible in all material aspects. The Court further finds that all law enforcement officers who testified at the suppression hearing were credible.

### III. DISCUSSION

Defendant seeks to suppress all evidence, and testimony related to such evidence, obtained as a result of the search and seizure of his handbag on March 9, 2019. Doc. 73 at 7. Defendant argues the search and seizure violated his Fourth Amendment rights because the encounter was never consensual, and law enforcement lacked reasonable suspicion to detain him or search and seize his property. *Id*. at 3-4. The Government argues the encounter between Defendant and Sergeant Pickens was initially consensual, but the officer then developed reasonable suspicion transforming the encounter into a *Terry* stop, and subsequently into a full-scale arrest. Doc. 79 at 6-7.

The Fourth Amendment provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…" U.S. Const. amend. IV. To protect citizens from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a court-sanctioned search warrant based on probable cause before searching private property. *See*, *e.g.*, *Shade v. City of Farmington*, 309 F.3d 1054, 1059 (8th Cir. 2000). The United States Supreme Court has held "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

The United States Supreme Court has described three categories of police-citizen encounters. *Florida v. Royer*, 460 U.S. 491, 497-99 (1983). The first and least intrusive police

contact "occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions." *United States v. Hernandez,* 854 F.2d 295, 297 (8th Cir. 1988). The Fourth Amendment's prohibition of unreasonable seizures is not violated "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Because this encounter in a public place is consensual, it does not constitute a seizure within the meaning of the fourth amendment." *Hernandez*, 854 F.2d at 297 (citing *Royer*, 460 U.S. at 497).

The second type of encounter, often referred to as a *Terry* stop,[19] is a brief, minimally intrusive seizure that is significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion. *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1144 (8th Cir. 2007). The third and final encounter is a full-scale seizure, which must be supported by probable cause to arrest. *Royer*, 460 U.S. at 499; *Hernandez*, 854 F.2d at 297. The Court first addresses whether the nature of the initial encounter was consensual, then examines whether law enforcement had reasonable suspicion for a *Terry* stop, and last whether probable cause existed for Defendant's arrest.

### A. The Initial Encounter Between Defendant and Sergeant Pickens

Consensual encounters do not trigger Fourth Amendment scrutiny. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions."); *see also United States v. Garcia*, 888 F.3d 1004, 1008 (8th Cir. 2018) (citation and quotation omitted). As discussed *supra*, a consensual encounter "occurs when law enforcement officers merely approach an individual on the street" or other public place, "ask if he is willing to answer some questions," and "a reasonable

---

[19] *See Terry v. Ohio*, 392 U.S. 1 (1968).

person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436; *Hernandez*, 854 F.2d at 297.[20] "The reasonable person test…is objective and 'presupposes an *innocent* person.'" *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 438) (emphasis in original).

During a consensual encounter, law enforcement may properly ask an individual questions even if the officers have no basis for suspecting the individual of wrongdoing, ask to examine the individual's identification, and request consent to search the individual's luggage, provided the officers do not induce cooperation by coercive means. *See Bostick,* 501 U.S. at 434-35 (citations omitted); *Drayton,* 536 U.S. at 201. If, however, the questioning during a consensual encounter becomes "so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave," the Fourth Amendment is implicated. *Flores-Sandoval,* 474 F.3d at 1145 (quoting *United States v. Hathcock*, 103 F.3d 715, 718 (8th Cir. 1997)).

To determine whether an encounter is consensual or has "ripened into a seizure," the Court examines seven non-exclusive factors: whether law enforcement's positioning limited the person's freedom of movement, the number of officers present, the officers' display of weapons, physical touching of the person, the use of language or intonation indicating compliance is required, the officers' retention of the person's property, or the officers indicating the person is the focus of a particular investigation. *Garcia*, 888 F.3d at 1009 (quoting *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012)). The analysis is fact-intensive, and whether an encounter implicates the Fourth Amendment depends on the unique facts of the case. *Aquino*, 674 F.3d at 923 (citation

---

[20] Relevant here, the Eighth Circuit has upheld consensual encounters between law enforcement and citizens at bus stations. *See, e.g.*, *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010); *United States v. Richardson*, 275 F. App'x 571, 572-73 (8th Cir. 2008); *United States v. Woods*, 213 F.3d 1021, 1022-23 (8th Cir. 2000).

omitted). The Government bears the burden of proving the encounter was consensual. *Garcia*, 888 F.3d at 1008.

Here, the undersigned recommends a finding that the initial encounter between Defendant and law enforcement was consensual up through the time when Defendant refused consent for a dog to sniff his bag. Defendant exited a bus at the Greyhound bus station, in Kansas City, Missouri, which is a public place. He voluntarily walked inside the terminal, carrying his own handbag, when he was first approached by Sergeant Pickens. Sergeant Pickens was wearing plain clothes at the time and did not display a weapon. There were other detectives in the general area, wearing plain clothes, but they remained at least five or more feet away from the conversation and did not engage Defendant. Sergeant Pickens approached Defendant, showed him his badge, and identified himself as law enforcement. At no time did he draw or display a weapon. There is no evidence he used any kind of force or intimidation when speaking with Defendant. Sergeant Pickens testified that he asked Defendant if he would be willing to speak with him, and Defendant replied, "Yeah, sure. Am I in trouble?"

When Sergeant Pickens asked to see his bus ticket and identification, Defendant voluntarily produced both. After his inspection, Sergeant Pickens returned the items to Defendant and did not retain possession of them. Defendant told the detective he was traveling from California to his home in St. Louis, and he had stayed in California for one or two days. Sergeant Pickens remained an appropriate distance from Defendant during the initial encounter. At the beginning of the encounter, Defendant did not attempt to leave, walk away, or otherwise distance himself from the detective. There was no indication by Sergeant Pickens that Defendant was the particular focus of an investigation. Based on these facts, there is no credible evidence to suggest the initial encounter

between Sergeant Pickens and Defendant was coercive or anything other than a consensual encounter.

Sergeant Pickens requested consent for a dog to sniff the bag that Defendant was carrying. According to Sergeant Pickens, Defendant initially consented but then later revoked his consent. As noted above, a request for consent to search a bag made during a consensual encounter does not implicate the Fourth Amendment. *See Bostick,* 501 U.S. at 434-35. Sergeant Pickens made a follow-up request for a dog to sniff the bags. The initial encounter did not lose its consensual nature because a follow-up request was made, especially in a situation where Defendant initially agreed to the dog sniff but then changed his mind. *See United States v. Jones,* 254 F.3d 692, 696 (8th Cir. 2001) (observing "[t]here is certainly no legal rule that asking more than once for permission to search renders a suspect's consent involuntary."); *United States v. Hathcock,* 103 F.3d 715, 717-20 (8th Cir. 1997) (finding multiple requests for consent to search a bag were deemed reasonable).

Defendant agrees consensual encounters do not trigger Fourth Amendment scrutiny. Doc. 73 at 3. However, Defendant argues his encounter with Sergeant Pickens was never consensual because he was "placed in [a] situation where he was not 'free to leave.'" *Id*. at 4. In support, Defendant cites *Michigan v. Chesternut*, 486 U.S. 567 (1988). The Supreme Court in *Chesternut* set forth the "necessarily imprecise" test to determine if an individual was "free to leave." *Id.* at 573. "The test provides that the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id*. at 573 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In *Chesternut*, the Court held the defendant was not seized when police drove parallel to the defendant who was a pedestrian and running down the street because the officers' actions

"would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the defendant's] freedom of movement." *Id*. at 574-75 (observing the officers did not activate the car's sirens or flashers, did not instruct the defendant to halt, did not display weapons, and did not operate the car in an aggressive manner). The brief acceleration by the police car and the short drive next to the defendant were not so intimidating to suggest he was not free to disregard their presence and go about his business. *Id.* at 576.

Here, similar to the facts of *Chesternut*, there is no credible evidence that the initial encounter was so intimidating that Defendant felt he was not "free to leave" or disregard the requests when the detective first approached him. Sergeant Pickens did not have physical contact during the stage of the encounter and maintained a proper distance from Defendant. He did not display a weapon or force, did not raise his voice, and did not indicate at that time that Defendant was under arrest, did anything wrong, or was the subject of an investigation. The other officers present were not in close proximity and did not engage Defendant. There was nothing said to suggest that compliance was required. Based on the totality of the circumstances, the undersigned recommends a finding that the initial encounter between Defendant and Sergeant Pickens began as a consensual encounter.

### B. The Sergeant's Reasonable Suspicion to Detain Defendant

The Government argues after the initial consensual encounter, Sergeant Pickens developed reasonable suspicion to detain Defendant and subject his handbag to a canine sniff, based on the totality of the circumstances. Doc. 78 at 7-10. The Fourth Amendment permits brief investigative stops when law enforcement has a particularized and objective basis for suspecting the person stopped is, or is about to be, engaged in criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (acknowledging an

officer must have reasonable suspicion that criminal activity may be afoot for a *Terry* stop and a frisk for weapons).

To assess whether an officer had reasonable suspicion based on specific, articulable facts, courts "look at the totality of the circumstances, allowing officers to draw on their experience and training." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (citing *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008)); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (recognizing reasonable suspicion allows officers "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them"). A court will consider what the officer reasonably knew at the time of the stop "rather than assessing the existence of reasonable suspicion 'with the vision of hindsight.'" *Slater,* 979 F.3d at 629 (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2021))

Reasonable suspicion does not require "absolute[] certain[ty];" instead, an officer must observe "unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot." *Lawhorn*, 735 F.3d at 821 (quoting *Terry*, 392 U.S. at 27, 30). Although the reasonable suspicion standard is somewhat abstract and requires more than a mere hunch, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Sanchez,* 955 F.3d 669, 674-75 (8th Cir. 2020) (quoting *Arvizu*, 534 U.S. at 274); *see also Kansas v. Glover,* 140 S. Ct. 1183, 1188 (2020) (observing that because reasonable suspicion is a "less demanding" standard, it "can be established with information that is different in quantity or content than that required to establish probable cause.") (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Significant to the pending matter, for officers to "briefly detain luggage for a sniff search without violating the Fourth Amendment, they must have either the owner's consent or a

reasonable suspicion supported by articulable objective facts that the luggage contains drugs." *United States v. Green*, 52 F.3d 194, 197-98 (8th Cir. 1995).

Because a court's determination as to reasonable suspicion must be based on the totality of the circumstances, it "may not view individual elements of suspicion in isolation." *Sanchez*, 955 F.3d at 675. Rather, a court "must view the individual elements in context, *i.e.*, in light of one another, and give 'due weight' to the officer's inferences when assessing the overall level of suspicion." *Id.* (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). The burden is on the Government to prove law enforcement "had reasonable suspicion that criminal activity was afoot, not that the subject of the stop was actively engaged in a crime." *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016).

Here, Sergeant Pickens was initially contacted by other members of law enforcement regarding an ongoing narcotics investigation. The sergeant was advised Defendant was suspected of transporting narcotics from California, which he knew to be a source state. Sergeant Pickens received Defendant's picture, along with identifying characteristics such as his height, weight, and age. He also searched Defendant's name in the police database and discovered he had a history of being violent toward the police. Based on this, Sergeant Pickens went to the Greyhound bus terminal in Kansas City, Missouri to conduct interdiction.

The sergeant observed Defendant was one of the last passengers to exit the bus, which he found suspicious because in his experience, drug traffickers often waited to exit the bus so they could watch for police. Immediately upon contacting him, Sergeant Pickens testified he smelled a strong odor of marijuana on Defendant's person. Defendant also repeated every question he asked back to him, as if he was trying to stall or fabricate a lie. Sergeant Pickens noticed Defendant appeared to be nervous and sweating. Defendant also looked around with his eyes as if to find a

24

place to flee. Additionally, the sergeant was suspicious that Defendant's bus ticket was paid for in cash and was a one-way bus ticket from California, after only spending a few days there. The officer also noticed a bulge in the front pocket of Defendant, which later turned out to be two cell phones and a bag with drugs.

Although Sergeant Pickens had already determined to detain the bag for a dog sniff, he asked Defendant if he would allow a canine to sniff his bags. Defendant initially consented, but then withdrew his consent. Defendant refused to relinquish the handbag and attempted to walk away. Sergeant Pickens renewed his request for consent as he was still attempting to obtain cooperation from Defendant. Sergeant Pickens also knew Defendant was designated as being violent toward police in the past. At this stage of the encounter, Sergeant Pickens made a determination to detain the Defendant as well for a weapons frisk and further investigation. Based on the totality of the circumstances, the observations of Sergeant Pickens provided reasonable articulable suspicion to warrant detention of the duffel bag and a detention of Defendant to conduct a weapons frisk.

Defendant argues Sergeant Pickens's claim that he smelled marijuana was "a pre textual [sic] reason to stop [him]." Doc. 73 at 4. Defendant claims the officers were "going to arrest and search [Defendant] regardless of any law violations" as they were "acting upon information received from other [o]fficers in Springfield, Missouri…." *Id.* In support of his argument, Defendant cites *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988). Doc. 73 at 5. In *Guzman*, the Tenth Circuit evaluated the standard for determining whether a traffic stop is unconstitutionally pretextual. 864 F.2d at 1515-17. Specifically, it found the standard to be whether "under the same circumstances, a reasonable officer *would* have made the stop in absence of the invalid purpose." *Id.* at 1517 (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.

1986) (emphasis in original)).  Notably, *Guzman* has since been overruled by the Tenth Circuit. *See United States v. Botero-Ospina*, 71 F.3d 783, 785 (10th Cir. 1995).  Regardless, Defendant's pretext argument is without merit as there was no credible evidence presented that the officer's stop was pretextual or conducted in a manner considered to be improper.[21]

Defendant also claims the *Terry* frisk of his person was unconstitutional; however, this argument also fails.  "While executing an investigative stop, officers can 'take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'"  *Pollreis v. Marzolf*, 9 F.4th 737, 746 (8th Cir. 2021) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).  Here, Sergeant Pickens observed Defendant's pocket to have a bulge, and he appeared to turn his hip away from the sergeant.  The sergeant also knew Defendant had a history of violence toward law enforcement.  Thus, when the officers frisked Defendant, they had a reasonable, articulable suspicion that he might be armed and dangerous, so this frisk was not unconstitutional.  Further, the frisk did not result in any incriminating evidence that Defendant seeks to suppress.

As discussed *supra*, the Eighth Circuit guides the undersigned's evaluation of an officer's reasonable suspicion based on the totality of the circumstances.  *Sanchez,* 955 F.3d at 675.  The undersigned recommends a finding that the Government has met its burden to establish Sergeant Pickens had reasonable suspicion criminal activity was afoot based on the totality of the circumstances, thus justifying his decision to detain Defendant, conduct a *Terry* frisk, and subject his handbag to a canine sniff.

Further, after Defendant was arrested for the positive drug alert to the suitcase on the bus, officers asked Detective Garcia to present his canine for an additional sniff check of Defendant's

---

[21] Defendant testified to his version of events on the date of his arrest; however, as noted above, the undersigned does not find Defendant's testimony as credible on all material aspects of the encounter.

handbag. Zina positively alerted to the odor of narcotics when she contacted Defendant's handbag. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." *United States v. Tuton*, 893 F.3d 562, 570 (8th Cir. 2018) (internal citation and quotation omitted). Accordingly, law enforcement had probable cause to believe Defendant's handbag contained drugs, and their application for a search warrant, and subsequent search of the handbag, were reasonable under the Fourth Amendment.[22]

### C.    The Inevitable Discovery Doctrine

The undersigned has recommended a finding that law enforcement had reasonable suspicion to detain Defendant, conduct a *Terry* frisk, and subject his handbag to a canine sniff. Thus, the resulting positive canine alert supported probable cause in the application for a state search warrant to search the bag. However, irrespective of the actions of law enforcement as analyzed above, the undersigned recommends an alternative finding that the evidence need not be suppressed pursuant to the inevitable discovery doctrine.

The Eighth Circuit recognizes two separate analyses when determining whether the inevitable discovery doctrine prevents suppression. *United States v. Baez*, 983 F.3d 1029, 1038-39 (8th Cir. 2020). Under the first approach, which has been endorsed by the Supreme Court, if the Government establishes by a preponderance of the evidence that the "evidence would have been acquired lawfully," the evidence is admissible. *Id.* at 1038 (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). In *United States v. Connor*, the Eighth Circuit set forth a second approach. 127 F.3d 663 (8th Cir. 1997). Therein, the Court held the inevitable discovery doctrine applied only if

---

[22] As noted above, Defendant does not challenge the search of the luggage on the bus as Defendant denied ownership of same. This Report and Recommendation does not analyze the dog sniff and subsequent search warrant for the bag found on the bus that displayed Defendant's name and phone number.

27

the government established by a preponderance of the evidence that (1) "there was a reasonable probability that the evidence would have discovered by lawful means in the absence of police misconduct," and (2) law enforcement was "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* at 667; *see also Baez*, 983 F.3d at 1039.

In *Baez,* the Eighth Circuit recognized it has been inconsistent as to which standard should apply when evaluating the inevitable discovery doctrine. *Baez*, 983 F.3d at 1039. Nonetheless, the Eighth Circuit utilized both standards when finding the evidence should not be suppressed. *Id.* at 1036-40. Regardless of which approach is utilized for the instant matter, the undersigned recommends a finding that the evidence need not be suppressed pursuant to the inevitable discovery doctrine.

Here, the evidence discovered in Defendant's handbag, which he seeks to suppress, would have been inevitably discovered. Simultaneous to Sergeant Pickens approaching Defendant in the bus terminal, Detective Garcia was conducting a sniff check of the luggage compartment of the bus with his narcotics canine. Zina positively alerted to the odor of narcotics in a suitcase with a tag reading "Cregg Matthews" and displaying a phone number associated with Defendant. Sergeant Pickens testified that even if they had not already located Defendant in the terminal, their standard practice after a positive canine alert on a bag is to check all passengers' bus tickets as they re-boarded to determine whose name matched the name displayed on suitcase to which Zina positively alerted. According to Sergeant Pickens, if he had not made any contact with Defendant prior to the dog sniff onboard the bus, they would have located, and arrested Defendant based on the positive alert to his luggage on the bus. Once arrested, his handbag would have been detained for a dog sniff and the officers would have sought a search warrant based on a positive alert.

28

Consequently, even if Sergeant Pickens had not already located Defendant in the bus terminal, law enforcement's separate investigation of the suitcase to which the canine positive alerted would have inevitably led the detectives to Defendant and resulted in the discovery of the evidence found in his handbag. Accordingly, the undersigned recommends a finding that the evidence seized need not be suppressed pursuant to the inevitable discovery doctrine.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress. Doc. 73.

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: September 17, 2021          */s/ W. Brian Gaddy*
                                 W. BRIAN GADDY
                                 UNITED STATES MAGISTRATE JUDGE